THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOSEPH WILLIAMS, | : 3:15-CV-1090 |
| Petitioner | : |
| v. | : |
| | : (JUDGE MARIANI) |
| NANCY A. GIROUX, *et al.*, | : |
| Respondents | : |

## MEMORANDUM OPINION

Petitioner Joseph Williams filed the instant *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Presently before the Court are Williams' objections to the Report and Recommendation ("R&R") filed by Magistrate Judge Martin C. Carlson. The Court finds that, although the lion's share of Williams' claims do not warrant habeas relief, at least one claim has potential merit, cannot be decided on the current record, and thus requires further development.

## I.     Background

In 2015, Williams filed a *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, which contained both exhausted and unexhausted claims. (Doc. 1). He requested a stay and abeyance while he exhausted his state-court remedies, which this Court granted. (*See* Docs. 3, 6).

When his lengthy state-court collateral proceedings reached their conclusion, the Court lifted the stay, reopened Williams' habeas case, and granted him leave to file an

amended Section 2254 petition. (Doc. 43). Williams filed his amended petition and supporting memorandum in November 2020, raising six grounds for relief. (Docs. 46, 46-1). After several extensions of time, Respondents filed their response to the amended petition. (Doc. 54). The case was then referred to Magistrate Judge Martin C. Carlson.

On August 17, 2021, Magistrate Judge Carlson issued an R&R (Doc. 56), recommending that Williams' Section 2254 petition be denied and that no certificate of appealability should issue. Williams thereafter filed objections (Doc. 60) to the R&R. Upon *de novo* review of Magistrate Judge Carlson's R&R, Williams' objections thereto, and all relevant filings, the Court will overrule most of Williams' objections. However, as to Williams' sixth ground for relief invoking *Brady v. Maryland*, 373 U.S. 83 (1963), the Court will defer ruling on this claim until the record is properly developed.

## II. Legal Standard

A district court may "designate a magistrate judge to conduct hearings, including evidentiary hearings, and to submit to a judge of the court proposed findings of fact and recommendations for the disposition" of certain matters pending before the Court. 28 U.S.C. § 636(b)(1)(B). If a party timely and properly files a written objection to a Magistrate Judge's Report and Recommendation, the District Court "shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *Id*. § 636(b)(1)(C); *see also Brown v. Astrue*, 649 F.3d 193, 195 (3d Cir. 2011); M.D. PA. LOCAL RULE 72.3.

## III. Discussion

Williams objects to nearly all aspects of the R&R. The Court, however, will address only those objections requiring discussion beyond that which has already been provided by Magistrate Judge Carlson's comprehensive report. Specifically, the Court will discuss Williams' objections with respect to habeas grounds 1, 2, 3, and 6.

### A. Ground One – Severance

Williams first contends that the R&R misconstrued his due process claim regarding the trial court's denial of his attempts to sever his case from codefendant Anthony Herndon. Williams maintains that the issue is not whether the state court's decision to deny severance was erroneous, but whether the trial judge "abused his discretion when he allowed [Williams'] trial to continue after explicitly finding that" the defenses presented by the codefendants were "clearly antagonistic." (Doc. 60 at 1 (quoting Doc. 54-20, 2/11/09 Trial Tr. at 56:22)). Williams further maintains that the R&R should have analyzed the "abuse of discretion factors" when deciding this habeas claim. (*Id.* at 2).

The problem with Williams' argument, however, is that habeas corpus is a collateral remedy and therefore this Court does not act as a court of direct review. *Teague v. Lane*, 489 U.S. 288, 306 (1989) (citation omitted). Unlike, for example, the Superior Court of Pennsylvania on direct appeal, a federal habeas court does not make determinations regarding whether a state trial court abused its discretion in denying severance. Instead, this Court is constrained to asking whether the state court's determination on severance

was "contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1)(A).

Under this highly deferential rubric, it is clear that the trial court's decision to press on—rather than declare a mistrial—despite believing the codefendants' defenses were antagonistic does not provide an avenue for federal habeas relief.[1] As several courts of appeals, including the Third Circuit, have noted, the United States Supreme Court "has explicitly rejected a per se rule requiring severance where two defendants present mutually antagonistic defenses." *Runningeagle v. Ryan*, 686 F.3d 758, 775 (9th Cir. 2012) (citing *Zafiro v. United States*, 506 U.S. 534, 538-39 (1993)); *United States v. Voigt*, 89 F.3d 1050, 1094 (3d Cir. 1996); *Hutchison v. Bell*, 303 F.3d 720, 731 (6th Cir. 2002) (quoting *Zafiro*, 506 U.S. at 538). Rather, the touchstone for severance challenges on habeas review is whether "misjoinder would rise to the level of a constitutional violation" in that "it results in prejudice so great as to deny a defendant his [due process] right to a fair trial." *United States v. Lane*, 474 U.S. 438, 446 n.8 (1986) (discussing joinder of federal defendants). Because joinder and severance are governed by state law, misjoinder would only warrant

---

[1] The Court notes that, when reviewing petitions under Section 2254, the district court must look to the "last reasoned decision" of the state courts on the claim. *Simmons v. Beard*, 590 F.3d 223, 231-32 (3d Cir. 2009) (citation omitted). For this severance claim, the last reasoned decision is the Pennsylvania Superior Court's affirmance on direct appeal. *See Commonwealth v. Williams*, No. 723 MDA 2009, 31 A.3d 741, at 5-11 (Pa. Super. Ct. June 10, 2011) (table) (nonprecedential). In its decision, the Superior Court essentially found that the codefendants' defenses did not "amount to legally cognizable antagonism" and therefore did not warrant severance. *See id.* at 10-11. This determination was not an unreasonable application of federal law, as the Superior Court applied a standard that is arguably easier to satisfy than federal severance jurisprudence and still found Williams' claim unpersuasive. And even if the Superior Court's application were contrary to clearly established federal law, which it is not, *de novo* review demonstrates that Williams' severance claim does not warrant habeas relief.

federal habeas relief when it deprives the defendant of "fundamental fairness" in the trial process. *See Estelle v. McGuire*, 502 U.S. 62, 72-73 (1991).

Williams has not made this difficult showing. He has not identified any basis—beyond antagonistic defenses—for why his joint trial was fundamentally unfair, nor has he established a specific constitutional right that was violated by being tried with Herndon. *See Zafiro*, 506 U.S. at 539; *Estelle*, 502 U.S. at 73 (explaining that "fundamental fairness" for due process is "narrowly" defined and cabined to violations of the Bill of Rights). In sum, Williams has not shown that the Pennsylvania Superior Court's rejection of this severance claim was an unreasonable application of clearly established federal law or that his joint trial was so prejudicial that it violated due process.

### B. Ground Two – Constructive Amendment

In his objection regarding ground 2, Williams argues that the Superior Court constructively amended his indictment. He contends that, on direct appeal, the Superior Court erroneously denied his sufficiency-of-the-evidence challenge and affirmed his robbery conviction under one subdivision of Pennsylvania's robbery statute—18 PA. CONS. STAT. § 3701(a)(1)(ii)[2]—even though he was indicted and convicted under a different subdivision—18 PA. CONS. STAT. § 3701(a)(1)(i).[3] According to Williams, this amounted to an unlawful

---

[2] Subdivision (a)(1)(ii) states, "A person is guilty of robbery if, in the course of committing a theft, he . . . threatens another with or intentionally puts him in fear of immediate serious bodily injury." 18 PA. CONS. STAT. § 3701(a)(1)(ii).

[3] Subdivision (a)(1)(i) states, "A person is guilty of robbery if, in the course of committing a theft, he . . . inflicts serious bodily injury upon another." 18 PA. CONS. STAT. § 3701(a)(1)(i).

and unconstitutional constructive amendment of his indictment. It does not appear that Williams raised this claim in state court. (*See generally* Doc. 54-11). Even if he had, it would not warrant habeas relief. *See* 28 U.S.C. § 2254(b)(2) (permitting denial on the merits of an unexhausted claim).

The Court recognizes that Williams' argument is not baseless. From review of the record, the Pennsylvania Superior Court indeed relied on a different and uncharged subdivision of the robbery statute in its analysis of Williams' sufficiency-of-the-evidence challenge. *See Commonwealth v. Williams*, No. 723 MDA 2009, 31 A.3d 741, at 11-15 (Pa. Super. Ct. June 10, 2011) (table) (nonprecedential). Pennsylvania law, however, explicitly holds that these statutory subdivisions are not interchangeable. *See Commonwealth v. Neal*, 418 A.2d 378, 380 (Pa. Super. Ct. 1980); *see also Commonwealth v. Brandon*, 79 A.3d 1192, 1194-95 (Pa. 2013) (differentiating subdivisions of Section 3701(a)(1) and holding that conviction under subdivision (a)(1)(v) that was never charged must be vacated).

Nevertheless, this does not mean that Williams' indictment was constructively amended. Williams was charged under subdivision (a)(1)(i), (*see* Doc. 54-1 at 3; Doc. 54-4 at 2), and this is the subdivision under which he was convicted, (*see* Doc. 54-1 at 4). There was, in fact, no amendment—constructive or otherwise—of his indictment. While the Superior Court may have relied on the wrong statutory subdivision on appeal, its analysis regarding attempted theft under 18 PA. CONS. STAT. § 3701(a)(2), together with the

6

...

indisputable fact that the jury found that Williams caused "serious bodily injury" when it convicted him of third-degree murder, demonstrates that there was no constitutional violation with respect to Williams' Section 3701(a)(1)(i) robbery conviction.

As to any constitutional claim regarding sufficiency of the evidence unrelated to constructive amendment, such a claim is meritless. Under the facts recited by the state court, and through the highly deferential lens of sufficiency claims on habeas review, the Court cannot conclude that the state court's sufficiency-of-the-evidence determination was "objectively unreasonable." *See Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (explaining that, on federal habeas review, a sufficiency-of-the-evidence challenge faces "two layers of judicial deference," and habeas courts cannot overturn a state court decision unless it was "objectively unreasonable"). Even under *de novo* review, there was sufficient evidence adduced at trial to sustain a Section 3701(a)(1)(i) conviction. Furthermore, it does not appear that Williams has pressed an actual sufficiency-of-the-evidence claim in his amended Section 2254 petition. (*See* Doc. 46 at 6 (defining his second claim as "violation of due process, affirming robbery conviction under" a subdivision of robbery statute for "which Petitioner was never charged"); Doc. 46-1 at 17). Thus, the Court will overrule Williams' objections related to ground 2 of his amended petition.

### C. Grounds Three, Four, and Five – Ineffective Assistance of Counsel

Williams' next three objections involve grounds 3, 4, and 5 of his amended petition, which allege ineffective assistance of trial counsel. The Court will provide additional

discussion only with respect to Williams' first ineffective-assistance claim involving trial counsel's alleged failure to investigate a potential witness.

Williams contends that his trial counsel was ineffective for failing to investigate or interview Joseph Griffith, an alleged eyewitness. Joseph Griffith is one of at least three Griffith brothers: Andrew, Joshua, and Joseph. (*See* Doc. 54-4 at 6; Doc. 54-10, 8/18/17 PCRA Hr'g Tr. 9:15-16). Joshua Griffith and Andrew Griffith were material eyewitnesses who testified at Williams' trial. (Doc. 54-4 at 6). The claim involving Joseph Griffith appears to have been exhausted in state court during the PCRA process, although it is unclear whether he was mentioned by name on appeal. (*See* Doc. 54-8 at 10); *Commonwealth v. Williams*, No. 836 MDA 2018, 2019 WL 4567545, at *1 (Pa. Super. Ct. Sept. 20, 2019) (nonprecedential). Nonetheless, because the Superior Court simply adopted the reasoning of the PCRA court, *see Williams*, 2019 WL 4567545, at *3, the "last reasoned decision" of the state courts is that of the PCRA court, *Simmons*, 590 F.3d at 231-32.

Review of the PCRA court's analysis of this claim demonstrates that its application of Pennsylvania's version of *Strickland v. Washington*, 466 U.S. 668 (1984), was objectively unreasonable. First, the PCRA court concluded that "there is no arguable merit to" Williams' ineffectiveness claim because trial counsel "did subpoena Joseph Griffin [sic] to testify," but he "still didn't testify" despite the subpoena. (Doc. 54-8 at 10). This is the entirety of the PCRA court's analysis of trial counsel's performance, the first *Strickland* prong. *See Strickland*, 466 U.S. at 687-88 (holding that "defendant must show that counsel's

8

representation fell below an objective standard of reasonableness"). However, as Williams points out, the fact that his trial counsel subpoenaed Joseph Griffith but never interviewed or investigated him—despite having full access to him because he was being detained by the Commonwealth—is primarily why his trial counsel's conduct was constitutionally deficient. (Doc. 60 at 5-6). Moreover, during the August 2017 PCRA hearing, Williams' trial counsel, when asked why he would have subpoenaed Joseph Griffith, admitted, "At this point in time I have trouble remembering. I would normally submit subpoenas [for] somebody if I felt they had relevant evidence that I wish to present." (Doc. 54-10, 8/18/17 PCRA Hr'g Tr. 51:21-52:1).

The PCRA court then summarily found that "there is no reasonable probability that the outcome would have been different" if trial counsel had "changed his tactics" because he "was left out [sic] other reasonable options." (Doc. 54-8 at 10). This too, is an unreasonable application of *Strickland* because—as Williams observes and the trial and PCRA hearing transcripts make clear—there obviously were other options that trial counsel could have pursued, namely, interviewing Joseph Griffith and possibly having him testify at trial depending on the outcome of that interview. Furthermore, the PCRA court fails to perform a prejudice analysis with respect to the other trial evidence and the purported testimony of the missing witnesses, including Joseph Griffith. *See Strickland*, 466 U.S. at 694 (holding that defendant must show "prejudice," described as "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been

9

different"). The PCRA court simply concluded that there could be no probability of a different outcome because trial counsel could not have done anything differently, which conflates the first and second prongs of the *Strickland* analysis and does not assess prejudice.

A state court's unreasonable application of clearly established federal law removes the deference required under Section 2254 and obligates the federal habeas court to review the claim *de novo*. *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007). This Court's *de novo* analysis for Williams' ineffective-assistance claim involving Joseph Griffith begins and ends with *Strickland*'s prejudice prong, *i.e.*, whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

Williams provides conflicting explanations about why he was prejudiced by the absence of Joseph Griffith's testimony. In his supporting memorandum to his amended habeas petition, Williams states that, "had his trial counsel questioned [Joseph] Griffith, counsel could have made a sound decision whether to call him as a witness, or not to call him as a witness." (Doc. 46-1 at 26). He then contends that Joseph Griffith "was in fact a favorable witness whose testimony was capable of corroborating [Williams' version of] events of the incident." (*Id.* at 29). Finally, in his objections to the R&R, he asserts that Joseph Griffith would have testified that his brothers, Andrew and Joshua, were lying about

10

being robbed by Williams so as to distance themselves from him and their prior statements that they had passed him a gun before the shooting. (Doc. 60 at 8).

The Court finds that, even if the conduct of Williams' trial counsel was constitutionally deficient for failing to interview Joseph Griffith, Williams has not shown that Joseph Griffith's alleged testimony would have had a reasonable probability of altering the outcome of trial. Williams' speculation as to what Joseph Griffith would have said on the witness stand, even if accurate, does not establish *Strickland* prejudice.

At trial, at least three of the Commonwealth's eyewitnesses offered testimony that supported Williams' version of events: Andrew Griffith, Joshua Griffith, and Joseph Anderson. (*See* Doc. 54-4 at 6). Those witnesses testified that Herndon was armed and that two or more shots were fired, supporting Williams' self-defense claim. (*See* Doc. 54-19, 2/10/09 Trial Tr. 27:16-28:12, 34:14-24, 44:4-11 (Andrew Griffith, testifying that Herndon was armed with a revolver, fired first, and that Williams fired in self-defense); *id.* at 150:11-151:8, 162:7-164:5, 168:24-169:19, 171:4-172:3 (Joshua Griffith, testifying that he heard multiple shots, witnessed Herndon holding a gun, and that Williams returned fire only after being shot at by Herndon); *id.* at 99:10-100:13, 101:7-14, 103:20-23 (Joseph Anderson, testifying that two people were armed and two shots were fired)). As discussed further below, *see* Section III(D), the jury did not believe this testimony. Williams has failed to establish why another Griffith brother's testimony disputing other witnesses' claims that a robbery occurred would have had a reasonable probability of affecting the outcome of his

11

trial. Accordingly, this ineffective-assistance claim fails and the Court will overrule Williams' objection thereto.

### D.     Ground Six – *Brady v. Maryland* Claim

Williams' sixth and final ground for habeas relief raises a Fourteenth Amendment due process claim under *Brady v. Maryland*, 373 U.S. 83 (1963). (*See* Doc. 46 at 17; Doc. 46-1 at 40-41). *Brady* holds that the government must disclose to a criminal defendant any evidence in its possession that is favorable to the defendant and material to guilt or punishment. *Brady*, 373 U.S. at 87. Failure to do so violates a criminal defendant's due process rights under the Fourteenth Amendment to the United States Constitution, "irrespective of the good faith or bad faith of the prosecution." *Id.* at 86, 87. The R&R does not address this final claim.

Williams asserts that he recently discovered photographs from the police investigation showing a vehicle—driven by Joshua Griffith on the day of the incident and parked across the street from where Herndon was positioned during the shootout—with a bullet hole in the front windshield. Joshua Griffith allegedly removed this car from the scene of the shooting before police arrived. Williams claims that these photographs were in the Commonwealth's possession at the time of trial, are corroborated by the PCRA testimony of Eugene Rainey, and would have been compelling physical evidence supporting his version of events, *i.e.*, that he only fired at Herndon in self-defense after Herndon shot at him.

12

Williams also argues that the photos could have led to discovery of additional physical evidence supporting his claim of self-defense, not the least of which being the car itself.

Williams' allegations have substantial record support. Numerous eyewitnesses testified at trial that Joshua Griffith drove his gray or silver Ford Escort station wagon to the scene shortly before the incident and parked on the north side of the street across from Anthony Herndon's house (624 Chestnut Street in York, Pennsylvania, which is situated geographically on the south side of Chestnut Street). The eyewitness testimony likewise placed Herndon on the porch or in the doorway of 624 Chestnut, either facing or firing at Williams—who was standing in the street—in a northward direction toward Joshua Griffith's vehicle. The most salient portions of that testimony are as follows:

- Kathy Shaeffer (a neighbor who lived on the south side of Chestnut Street), testified that, when she returned home from work around 5:00 p.m., she observed Herndon and John Mason—the eventual victim—sitting on Herndon's front porch at 624 Chestnut Street. (Doc. 54-18, 2/9/09 Trial Tr. 86:12-14, 87:3-13). She then heard a "commotion" outside followed by a gunshot, looked out her window, and saw Joseph Anderson and three white males in front of her house; two of the white males fled on foot, and Anderson and another white male ran "across the street," the white male got into the driver's side of a "silver or gray" Escort and put it in reverse, Anderson got into the passenger's side, and the car left the scene. (*Id.* at 86:20-89:4).

- Andrew Griffith testified that, around the time of the incident, he was "riding around" with Joshua Griffith and Joseph Anderson in Joshua's "gray station wagon." (Doc. 54-19, 2/10/09 Trial Tr. 20:20-21:22). Andrew stated that they drove to Chestnut Street, parked "on the other side of the street" and walked over to where Herndon lived at 624 Chestnut. (*Id.* at 21:12-22:9). According to Andrew, Williams was "standing in the street" while the rest of the people involved were "on the porch"; Williams did not approach the porch; Williams backed up—away from 624 Chestnut—when he saw Herndon come out of the house with a gun; and Williams was backing away when Herndon fired at him. (*Id.* at 23:1-5, 24:12-13, 26:7-22, 27:16-22, 43:24-44:11).

13

- Khalil Carter (Mason's brother and Herndon's "God brother") identified Joshua Griffith as "the driver" of the car, and attested that Williams was standing "across the street" from 624 Chestnut and everyone else was located on the porch, including Herndon, who was "by the door." (*Id.* at 66:12-22, 69:1-5, 73:4-19, 82:7-13). He further testified that, after Mason was shot, he saw Joshua Griffith and Joseph Griffith get into Joshua's car, they "pulled off," and "left Joe Williams." (*Id.* at 77:23-78:11).

- Joseph Anderson testified that, around the time of the shooting, he was with Andrew Griffith and Joshua Griffith and Joshua was driving, and they were headed for Joseph Anderson's father's house, who lived at 662 Chestnut Street. (*Id.* at 96:21-25, 97:18-98:3). He further attested that, during the shooting incident, he witnessed an arm with a gun coming out of Herndon's residence, pointing at the "guy" in the street. (*Id.* at 99:24-25, 103:6-15).

- Beronia Jackson (Herndon's brother, who also resided at 624 Chestnut) testified that—on the day in question—he observed Joseph Anderson and Joshua Griffith exiting Joshua's "station wagon," which was "parked across the street from my house on Chestnut Street," and walking toward his house. (*Id.* at 128:8-129:1, 130:9-17, 131:1-10). As to placement of the codefendants, Jackson attested that Herndon was on the front porch, "right in front of the doorway," and that Williams was half on the street and half on the sidewalk, directly in front of the doorway. (*Id.* at 134:12-20, 135:11-16). Jackson further testified that, after the shooting, he looked out the window of his house and saw Joseph Anderson and Joshua Griffith (and either Andrew Griffith or Joseph Griffith) "run to the station wagon." (*Id.* at 139:14-140:2).

- Joshua Griffith testified that, on the day in question, he drove with Andrew Griffith and Joseph Anderson in "my station wagon" toward Anderson's father's house on Chestnut Street, but was "called . . . down the street" to Herndon's house. (*Id.* at 148:12-150:4). According to Joshua, he parked his car "right there across the street . . . on the other side" of 624 Chestnut. (*Id.* at 162:7-19). Joshua attested that Herndon was on the porch and Williams was standing in the street "right by the yellow line," directly facing the door of 624 Chestnut. (*Id.* at 150:11-20, 160:25-161:10). After two shots were fired, Joshua recalled, "I got in my car and I left[;] I drove off" with one of his brothers and Joseph Anderson. (*Id.* at 150:22-151:2, 151:15-17). Joshua was also questioned during trial about whether Herndon had called him later that evening to tell him that the police were looking for his car, and Joshua responded, "Yes." (*Id.* at 164:17-165:6).

14

Additional evidence regarding Joshua Griffith's car was adduced during the June 2017 PCRA hearing, where Eugene Rainey testified. Williams met Rainey in 2011 while they were both incarcerated at SCI Albion. (*See* Doc. 54-9, 6/28/17 PCRA Hr'g Tr. 12:6-11). Rainey—who lived next door to Joshua Griffith—testified that, on the day in question, he personally witnessed (1) Joshua Griffith and others drive up in the at-issue vehicle and run into their house; (2) police outside their respective residences near the car Joshua Griffith had been driving earlier in the day; (3) the at-issue vehicle with what appeared to be a circular bullet hole in the front windshield; and (4) later that same evening, blue tape placed over the hole in the windshield.[4] (*Id.* at 12:6-17, 19:13-23:10). Rainey further testified that, when he had gone over to Joshua Griffith's house to find out what was "going on," Joshua said that the group "was at the shooting and somebody shot at his car" and "I think my car was shot," which prompted Rainey to inspect the vehicle.[5] (*Id.* at 20:6-13, 21:21-22, 22:2-9). In Rainey's estimation, "[i]t looked like the car was shot," as he had previously seen a vehicle with a gunshot hole that looked "almost identical" to the hole in Joshua Griffith's front windshield. (*Id.* at 23:4-5, 31:12-22).

---

[4] The Court rejects any characterization by the Commonwealth of this testimonial evidence as hearsay. (*See, e.g.*, Doc. 54 at 40). Rainey primarily testified as to his own personal observations of who was driving the car and the circular hole in the windshield, which do not implicate hearsay concerns.

[5] During the PCRA hearing, the Commonwealth objected to these statements from Joshua Griffith as hearsay, but that objection was overruled by the PCRA court because they were not being used for the truth of the matter asserted, but rather to explain "the effect upon the listener" and why Rainey "took certain action." (6/28/17 PCRA Hr'g Tr. 20:14-21:8).

The materiality of this photographic evidence is straightforward. Williams' entire trial strategy was predicated on self-defense. This defense, if believed by the jury, would have foreclosed a murder conviction of any degree, including third-degree murder.[6] *See Commonwealth v. Fowlin*, 710 A.2d 1130, 1132, 1134 (Pa. 1998) (holding that a person who inadvertently injures a third-party bystander while lawfully exercising his right to self-defense cannot be "simultaneously found to have justifiably acted in self-defense and be criminally liable for crimes involving recklessness or malice"); *see also* 18 PA. CONS. STAT. §§ 502, 505.

Williams never disputed that his single gunshot resulted in a bystander's death; rather, he has steadfastly maintained that he only fired his weapon in self-defense after being fired upon by Herndon, accidentally striking Mason. *See, e.g., Commonwealth v. Williams*, No. 723 MDA 2009, 31 A.3d 741, at 3-4, 5, 10 (Pa. Super. Ct. June 10, 2011) (table) (nonprecedential); (Doc. 46-1 at 44; Doc. 54-10, 8/18/17 PCRA Hr'g Tr. 34:19-35:20 (trial counsel explaining that entire defense—from opening statement to closing statement and every question asked—was "geared toward that [self-defense] theory")).

Additionally, the Commonwealth presented testimony at trial from Sergeant Troy Bankert, who specifically attested that the crime scene was searched for damage to

---

[6] The Pennsylvania Supreme Court has defined third degree murder as "a class of wanton and reckless conduct . . . which transcends the negligent killing [of involuntary manslaughter] and reaches to the level of malice." *Commonwealth v. Packer*, 168 A.3d 161, 169 (Pa. 2017) (citation omitted).

surrounding buildings and vehicles and none was found, inferring that only one weapon was discharged that day. (Doc. 54-4 at 6; Doc. 54-18, 2/9/09 Trial Tr. at 140:6-141:10). The Commonwealth also specifically argued, during Williams' PCRA proceedings, that Rainey's testimony was not credible or material, in part because it was unsupported by "photographs of [the] damage" to Joshua Griffith's car. (Doc. 54-12 at 19-21).

It is evident from the record that Herndon's acquittal of aggravated assault and reckless endangerment, and Williams' conviction for third-degree murder, hinged directly on whether the jury believed that Herndon was armed and fired at Williams. In acquitting Herndon and convicting Williams, the jury appears to have credited the witnesses who testified that Herndon was unarmed and never shot at Williams and to have discredited the three witnesses who testified to the contrary. (*See* Doc. 54-4 at 8 (trial court 8/17/09 Rule 1925(a) opinion explaining, "Numerous witnesses testified that only one (1) shot was heard and several witnesses identified [Williams] as being the only individual with a weapon on [the day of the shooting]. The jury *obviously believed this testimony* because Anthony Herndon was found not guilty of all charges." (emphasis added))). As Williams aptly observes, physical evidence establishing that Herndon fired at him and struck a vehicle parked at the scene—evidence untethered to the credibility of witnesses who had criminal histories and who gave prior inconsistent statements to police—could have been the difference between conviction and acquittal for the murder charge.

17

This *Brady* claim involving the vehicle photos appears to be unexhausted. Although Williams presented Rainey's testimony as after-discovered evidence during his state PCRA proceedings, (*see* Doc. 54-8 at 3), he did not raise the issue regarding the allegedly exculpatory photographs with the state courts. As Williams explains, this is because he was not made aware of the photos until after his brother purchased Attorney David E. Cook's case file. (*See* Doc. 60 at 4; Doc. 60-1 at 1). According to documents provided by Williams, the photographs of the at-issue vehicle with a hole in the windshield covered by tape were included in the "Discovery information" in Attorney Cook's file and transferred to Williams' brother on October 2, 2019. (Doc. 60-1 at 1-2).

The difficulty with reviewing this claim, however, is that Williams does not specify when he was represented by Attorney Cook or when the photos in question were turned over by the prosecution. From the York County Court of Common Pleas criminal docket sheet, it appears that Attorney Cook was a private defense attorney appointed to represent Williams, possibly late in the lengthy state PCRA process, which spanned from 2012 to 2020. (*See* Doc. 54-1 at 5, 23; Doc. 22); *Commonwealth v. Williams*, 229 A.3d 908 (Pa. 2020) (table) (denying petition for allowance of appeal in PCRA proceedings).

Thus, it is impossible at this juncture to tell whether Williams' claim is a true *Brady* claim or whether it sounds in ineffective assistance of counsel. According to the instant record, potentially material physical evidence that would corroborate Williams' assertion of self-defense was turned over to one of his attorneys at some point during "discovery"—but it

18

is unclear when or how that occurred. If the photographs were in the prosecution's possession but were not disclosed until PCRA proceedings, Williams' *Brady* claim may have merit. *See Dennis v. Sec'y, Pa. Dep't of Corr.*, 834 F.3d 263, 298 (3d Cir. 2016) (*en banc*) (noting that *Brady* material was suppressed by prosecution when it was "not revealed to defense counsel until PCRA discovery, ten years after trial"). Alternatively, if the photos were properly turned over to trial counsel before trial and no action was taken, Williams' claim would sound in potential ineffective assistance of trial counsel.[7]

The Court, therefore, is not positioned to resolve this claim. Numerous relevant questions remain unanswered, including: When and for how long did Attorney Cook represent Williams? When did Attorney Cook receive the photos of the vehicle in question, and from whom did he receive them (*e.g.*, from the Commonwealth or from a previous defense attorney)? Did Attorney Cook take any action with regard to the photos during the time he represented Williams? Were copies of these photos ever disclosed by the prosecution to trial counsel before trial?[8] When did Williams receive the photos from his brother? And finally, as it appears that this claim was not raised in state court, is the claim procedurally defaulted and, if so, is there a basis to excuse procedural default?

---

[7] The Court notes that, if trial counsel had the photos and did nothing with them, and then PCRA counsel failed to raise this issue during state post-conviction proceedings, it is possible that procedural default of an ineffective-assistance-of-trial-counsel claim could be excused under *Martinez v. Ryan*, 566 U.S 1 (2012).

[8] Williams contends that the prosecution had these photos in its possession since the police investigation, failed to turn them over to trial counsel before trial or during direct appeal, and in fact later argued during the PCRA process that such evidence did not exist. (Doc. 60 at 3-4).

19

The Court thus finds that Williams' potential *Brady* claim, when considered together with the PCRA testimony of Eugene Rainey and the record as a whole, is a nonfrivolous habeas claim that will at least require additional investigation and briefing and may necessitate an evidentiary hearing. Due to the nature of this claim and the extensive delay in Williams' state post-conviction proceedings, (*see, e.g.*, Docs. 7-9, 13-20, 22, 25-41, 43), the Court additionally finds that appointment of counsel under the Criminal Justice Act, 18 U.S.C. § 3006A, is warranted.

## IV. Conclusion

The Court will adopt the R&R's reasoning only as to the ineffective-assistance-of-counsel claims in grounds 4 and 5. For the reasons set forth above, the Court will overrule Williams' objections on grounds 1 through 5, deny habeas relief on these first five grounds, defer ruling on Williams' sixth ground for relief until the record is fully developed, and appoint counsel to represent Williams on this remaining claim. An appropriate Order follows.

Robert D. Mariani
United States District Judge

Dated: April 5, 2022